Charles **SCHWARTZMAN** and Mary Schwartzman, Plaintiffs,

v.

**TENNECO MANUFACTURING COMPA-NY** (Surviving corporation after merger of Cary Chemicals, Inc. with and into Tenneco Manufacturing Company), Tenneco Corporation and Cary Chemicals, Inc., Defendants.

Jack **PALLATZ**, Plaintiff,

v.

**TENNECO MANUFACTURING COMPA-NY**, Tenneco Corporation, Cary Chemicals, Inc., and Tennessee Gas Transmission Company, Defendants.

Civ. A. Nos. 2998, 3080.

United States District Court,
D. Delaware.

Dec. 9, 1970.

Lewis S. Black, Jr., Wilmington, Del., court-appointed attorney for the Class 1 Potential Distributees.

Charles S. Crompton, Jr., Wilmington, Del., court-appointed attorney for the Class 2 Potential Distributees.

## OPINION

LATCHUM, District Judge.

This is the final chapter to litigation which had its origin both in this Court and in the Court of Chancery of the State of Delaware. The purpose of the present proceedings is to determine which of two classes of persons is entitled to the payment of funds on deposit in this Court which were received in settlement of this litigation.

### The Underlying Actions

This litigation involved four separate actions. The first suit, Kaminsky v. Beringer, C.A. 2150, was brought in the Court of Chancery of the State of Delaware on March 8, 1965. An amended and supplemental complaint, filed on March 31, 1965, asserted both derivative and direct claims on behalf of Cary Chemicals, Inc. ("Cary") and its stockholders. The defendants were Cary, Tenneco Manufacturing Company (":Tenneco M") (formerly known as Tenneco Chemicals, Inc.), Tenneco Corporation ("Tenneco") and eleven directors or former directors of Cary. Two causes of action were alleged. The first, which had been the sole claim asserted in the original complaint, charged, *inter alia*, the directors and former directors of Cary with waste of corporate assets and breach of fiduciary duty by (1) causing Cary to enter into a contract with Tenneco Chemicals, Inc. (Tenneco M), a wholly owned subsidiary of Tenneco, to purchase all of its requirements of vinyl chloride monomer ("VCM"), its principal raw material used in plastics, from Tenneco Chemicals, Inc. (Tenneco M) at an excessive price and on unfair terms; (2) paying excessive compensation to George F. Blasius, the former president of Cary, for the performance of little or no services as a consultant; (3) causing the resignation of Blasius and Irving T. Brennan, another former Cary director, in order to replace them with Tenneco nominees; and (4) selling Great Bay Chemicals and Plastics, Inc., a Cary subsidiary, to Blasius and Brennan at an excessively low and unfair price. The second cause of action charged that the terms of the agreement merging Cary into Tenneco M, effective April 12, 1965, were unfair to Cary stockholders and that the proxy statement distributed to Cary stockholders in connection with the special meeting at which the merger was approved contained false and misleading statements and was incomplete.

The second suit filed in the Court of Chancery, Pallatz v. Tenneco Manufacturing Company, C.A. 2160, was brought on March 31, 1965. In addition to the defendants named in the *Kaminsky* suit, Tennessee Gas Transmission Company ("Tennessee"), the parent to Tenneco, was named as a defendant. *Pallatz* was brought as a direct class action in behalf of Cary shareholders. The complaint alleged that the merger was fraudulently conceived as the result of a conspiracy and that the terms of the merger were unfair because the minority shareholders' stock would be illegally watered by the exchange ratio, set by the merger agreement, of 1 share of Tenneco M stock for each 10 shares of Cary. It was also alleged that, as a result of the VCM contract, Cary was undervalued and Tenneco M overvalued and that the proxy statement was false and misleading.

The first action brought in this Court, Schwartzman v. Tenneco Manufacturing Company, C.A. 2998, was commenced on April 5, 1965. A second amended and supplemental complaint, filed on April 20, 1965, named Tenneco M and Cary as defendants. The amended complaint alleged only a class action on behalf of Cary's minority stockholders. It contained six separate claims, two of which, asserting diversity jurisdiction, complained that the proxy statement contained omissions and misrepresentations and that the terms of the merger were unfair. It also alleged four other claims

that the proxy statement violated Sections 14(a) and 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a) and 78j(b). The unfairness of the merger was alleged to have resulted because the claimed overcharge by Tenneco M for VCM sold to Cary was not considered in establishing the exchange ratio nor was any value accorded to an option right held by Cary to acquire Tenneco M shares.

The final action, Pallatz v. Tenneco Manufacturing Company, C.A. 3080, was filed in this Court on August 30, 1965 naming Tenneco, Tenneco M, Cary and Tennessee [1] as defendants. An amended complaint, filed December 22, 1965, asserted a class action and derivative claims and contained allegations that the merger terms were unfair and that the proxy statement violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) in that it operated as a device and scheme to defraud in connection with the purchase and sale of securities.

*The Settlement*

On April 22, 1966, the parties presented a Joint Stipulation of Settlement to this Court and the Court of Chancery covering all four actions. The Stipulation provided that Tenneco M was to pay the sum of $422,515.60 in consideration of the dismissal of all claims asserted in the four suits. This sum, after the allowance of counsel fees and disbursements, was to be distributed to (a) *either* (1) those persons (other than Tenneco) who were Cary stockholders as of the date of the merger (April 12, 1965), but who did not hold Tenneco M stock issued in exchange for Cary stock on a record date, after the settlement, to be set by the Court *or* (2) the holders (other than Tenneco) of Tenneco M stock issued in exchange for Cary shares and held on

the Court's record date by persons other than those who were Cary stockholders as of the merger date *and* (b) those persons (other than Tenneco), who were stockholders of Cary on April 12, 1965 (the merger date), who did not turn in their Cary shares, who still held those shares and who did not demand or who withdrew a demand for appraisal rights pursuant to 8 Del.C. § 262 when and if they turned in their shares for exchange for shares of Tenneco M.

The parties agreed and the Stipulation so provided that the persons described in group (b) above were to receive their proportionate share of the $422,515.60 paid in settlement. However, the parties were unable to determine whether the remainder of the settlement funds should be distributed to Class (1) or (2) in group (a) described above. Accordingly, the Stipulation provided that the undistributed funds belonging to either Class (1) or (2) of group (a) described above would be "paid into the District Court for the District of Delaware pending determination [of this issue] by *that* Court."

After notice was given on April 25, 1966 to all interested persons pursuant to then Rule 23(c), F.R.Civ.P., a joint hearing on the fairness and reasonableness of the settlement was held by this Court and the Court of Chancery on June 2, 1966.[2] On the same date both Courts approved the settlement.[3] On August 10, 1966, this Court fixed June 3, 1966, the day following the approval of the settlement, as the record date for the determination of those Tenneco M transferees who were potential distributees under the second of the two alternative methods of distribution.

Subsequent orders of this Court and the Court of Chancery approved the allowance of attorneys' fees and disburse-

---

1. Tennessee was added as a party defendant after the suit was originally filed.

2. The joint hearing was presided over by Chief Judge Caleb M. Wright of this Court and Vice Chancellor William Marvel of the Court of Chancery.

3. The order approving the settlement was affirmed by the United States Court of Appeals for the Third Circuit. Schwartzman v. Tenneco Manufacturing Company, 375 F.2d 123 (C.A. 3, 1967).

ents out of the settlement fund, the payment of $177,148.39 to the individuals who were Cary stockholders on the merger date and continued to hold Tenneco M stock issued in exchange for shares of Cary stock on the Court's record date, the setting aside of $12,843.32 for payment of those remaining stockholders of Cary shares who had not submitted their shares in exchange for Tenneco M stock, and the payment of $4,690.63 to certain other Cary stockholders who had subsequently submitted their shares in exchange for Tenneco M stock.

By an order dated July 29, 1970, this Court set November 17, 1970, as the date for a hearing on the question of which of the two classes of potential distributees would share in the remainder of the settlement fund. In that order the Court also appointed counsel [4] to represent each of the classes of potential distributees and directed Tenneco Corporation, the parent of Tenneco M, to notify the members of each class of the deposit of the settlement fund in this Court, of the appointment of counsel for each class and of their own right to appear by counsel and participate in the litigation.

*The Distribution*

The two classes of potential distributees, as delimited by the Court's Order of June 2, 1966, are:

Class 1—those individuals who were Cary shareholders as of the merger date (April 12, 1965) but who did not hold the Tenneco M stock issued in exchange therefor on June 3, 1966 (the day after the Court approved the settlement).

Class 2—the holders or subsequent transferees of the 43,981 shares of Tenneco M stock issued in exchange for Cary shares and held on June 3, 1966 by individuals other than the Cary shareholders as of the merger date.

The matter came on for hearing on November 17, 1970. No member of either class personally appeared or took part. Each class was represented solely by its court-appointed attorney. Both attorneys have very capably briefed and argued the respective positions.

The contending classes are in sharp dispute on the question of whether the settlement fund was generated as a result of the direct class claims of Cary's minority stockholders or as a result of the derivative claims asserted in the litigation. Class 1 contends that the settlement fund was created in lieu of a recovery on the class claims asserting the individual rights of the minority stockholders under federal law to receive a fair proxy statement. Thus, they argue that the persons damaged by reason of the unfair merger terms were the former owners of Cary stock who failed to receive a fair equivalent for their investment upon consummation of the merger after publication of the allegedly misleading proxy statement. Thus, it is argued, they are entitled to a proportionate share of the settlement fund to make them whole.

Class 2, on the other hand, argues that the underlying wrong complained of in all four actions was the unfairness of the VCM contract resulting in a waste of Cary's assets, that the recovery of wasted assets is a derivative action, and under Delaware law, only the corporation wronged or its survivor may participate in such a recovery. Bokat v. Getty Oil Company, 262 A.2d 246 (Del.Supr.1970); Braasch v. Goldschmidt, 41 Del.Ch. 519, 199 A.2d 760 (1964). Thus, it is contended, the settlement fund passed to Tenneco M and should be distributed to its stockholders as of the Court's record date, June 3, 1966.

After analyzing the settlement proceedings, this Court is satisfied that no part of the settlement fund, the distribution of which is now before the Court, was intended by the parties to the Stipulation of Settlement or by the Courts approving the settlement to be consideration for the release of the derivative

4. Lewis S. Black was appointed counsel for the Class 1 potential distributees and Charles S. Crompton, Jr. was appointed to represent the Class 2 potential distributees.

claims asserted. Several factors support this conclusion.

First, the settlement agreement provided a separate and distinct consideration for the settlement of any derivative claim which might have passed to Tenneco M by virtue of the Cary-Tenneco M merger. The Stipulation contained two separate paragraphs concerning the settlement of the four related actions. The first, in part, provided that "(1) Tenneco M will make available for distribution the sum of FOUR HUNDRED TWENTY TWO THOUSAND FIVE HUNDRED FIFTEEN DOLLARS AND SIXTY CENTS ($422,515.60) * * *." This paragraph goes on to provide for distribution of that fund (after deduction of legal fees and expenses) to various "persons", including those in Class 1 or Class 2 as the Court may determine. The second relevant paragraph provides, in part, as follows: "(2) Tenneco M, successor by merger to Cary, shall execute a release in favor of each defendant in the form annexed hereto as Exhibit 'A'." Exhibit A, in turn, was a release by Tenneco M, as Cary's successor, of all of its claims against the defendants for the separate and nominal consideration of $1.00.

The only logical reading of these two paragraphs of the Stipulation is that the $422,515.60 fund was created in settlement of the direct, personal claims of various classes of "persons", i. e. stockholders, and should be directly distributed to them. No reference was made in this paragraph to any claims that might have existed on behalf of Cary, and Tenneco M (Cary's successor) was not included as a recipient of any part of this fund. In fact, it was Tenneco M which paid the fund. The second paragraph, on the other hand, recognizing the existence of possible derivative claims in the litigation, provided for Cary's successor to release any claim which it might have had against the defendants. These possible claims were expressly released for the separate nominal consideration of $1.00.

Second, of the total of twelve separate claims set forth in both the Federal and Chancery actions combined, ten alleged violations of direct, personal rights of the shareholders and only two asserted derivative claims. All six counts in the *Schwartzman* complaint and two of the three counts in the *Pallatz* federal suit complained of violations of the shareholders' personal rights under federal or state law. The *Kaminsky* complaint was framed in two counts, one derivative, based upon waste of corporate assets and breach of the directors' fiduciary duty and the other direct, based upon the false and misleading proxy statement. The *Pallatz* Chancery suit contained one direct action count, grounded on the watering down of the plaintiffs' interest in the corporation, through the utilization of a false and misleading proxy statement. Taken as a whole, it seems far more logical to consider that the settlement fund in question was created in settlement of the ten direct claims rather than the two derivative claims. If it were held that the fund was intended to settle the two derivative claims, then this Court would have to reach the startling conclusion that the more numerous direct claims were settled for nothing.

Third, the injury of which all the plaintiffs complained, common to all four actions, was the allegedly misleading proxy statement and the actions taken at the Special Stockholders' Meeting of April 12, 1965 at which Cary stockholders acted on the basis of the information supplied therein. On that date, the exchange ratio of one share of Tenneco M for ten shares of Cary was immutably fixed by approval of the merger agreement by Cary stockholders. Inducing individual stockholders, by means of a proxy statement violative of Section 14 (a), to vote for a merger which causes them economic injury gives rise to a direct cause of action for the damages sustained. Cf. Howard v. Furst, 238 F.2d 790 (C.A.2, 1956), cert. den. 353 U.S. 937 77 S.Ct. 814, 1 L.Ed.2d 759 (1957); Dann v Studebaker-Packard Corp., 288 F.2d 201 (C.A.6, 1961) While it is true

the unfair terms of the VCM contract underlaid the claim that the exchange ratio was not fair, this would not otherwise convert a direct action asserting the individual right of the stockholders under federal law to receive a fair equivalent for their stock in the merger [5] into a derivative action on behalf of Cary or Tenneco M to recover for wasted assets. Cf. Polakoff v. Delaware Steeplechase & Race Ass'n, 254 F.Supp. 574, 580 (D.Del. 1966). Rights having been asserted under Section 14(a) and 10(b) of the Securities and Exchange Act of 1934, the settlement proceeds received in lieu of judgment should undoubtedly be distributed as compensation for the damage sustained by reason of the merger. This damage would be that sustained by former stockholders of Cary who failed to receive a fair equivalent for their interest as a consequence of the publication of the allegedly misleading proxy statement.

Making distribution to Class 1 appears to rest on a more reasonable and logical construction of the approved settlement. If, as plaintiffs charged in all four complaints, Cary stock was worth more than one share of Tenneco M for ten Cary shares, the forced exchange effected by the merger caused a loss to Cary stockholders which was fixed when the merger was consummated on April 12, 1965. Obviously this loss could not have been transferred after the merger to a purchaser of Cary stock or of Tenneco M stock exchange for Cary stock. If such a purchaser bought Cary stock he bought nothing more than the right to exchange ten shares of Cary for one share of Tenneco M. If he purchased Tenneco M stock from a former holder of Cary, each share of Tenneco M that he bought reflected the exchange of ten shares of Cary. In either case the seller· was forced to sell at the ten-to-one price fixed on April 12, 1965. If the Cary stock was undervalued in the merger, the seller received less than he deserved. The buyer got what he paid for, i. e., ten shares of Cary worth one share of Tenneco M or one share of Tenneco M which had been purchased with ten shares of Cary.

Further, it appears that Class 1 was, of the two contending classes, the only one which was presumably injured by the allegedly unfair merger ratio. This injury occurred upon the fixing of the unfair terms and the public announcement of those terms, so that subsequent exchanges or sales were based on the unfair ratio. Since only Class 1 claimants sustained a legal injury by receiving and acting upon the misleading proxy statement, any right to the settlement proceeds, which Class 2 purports to have, could have arisen only by virtue of a purchase of that right in connection with the purchase of either Cary or Tenneco M stock. This is implicitly recognized by the Class 2 claimants but they contend that when the Class 1 claimants sold their Cary stock "at a profit", their transferees paid for a "dividend" in the form of a share of the later created settlement fund. Thus, it is argued that "[t]o now award the seller a portion of the settlement fund would permit him a double recovery of his share of this fund." There is, however, nothing in the present record to show that any Class 1 claimant sold Cary or Tenneco M stock at a profit and there is no evidence to indicate that any Class 2 member paid a premium to purchase a prospective share in the later created settlement proceeds. The more reasonable presumption is that a purchaser knew that a Cary share represented no more than 1/10 share of Tenneco M and that the price he paid reflected this exchange ratio.

Further, Class 2 argues that everyone in Class 1 who sold either Cary or Tenneco M stock opted out of the suit and thereby disqualified himself from participating in any judgment or settlement. To support this proposition Class 2 relies on Speed v. Transamerica Corp., 135 F.Supp. 176, 202 (D.Del.1955), modified and affirmed on appeal, 235 F.2d 369 (C.A.3, 1956). In that case, Judge Lea-

5. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 388–389, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

hy held that Benson, one of the plaintiffs who had not turned in his Class A shares for redemption but who had later sold his shares at a profit prior to the determination of liability, was not entitled to participate in the recovery because "[h]e took himself out of the class which was litigating." This holding was based on two findings: (1) that Benson's sale was not induced by fraud, because the record showed that he knew of the litigation and potential recovery when he sold his stock and (2) that Benson sustained no damages because the record showed he had apparently sold at a profit. Neither of these bases has been shown in the present proceeding. Moreover, in excluding Benson the Court did not substitute his transferee as the person entitled to receive a proportion of the recovery.

Finally, as between the two contending classes, it appears more logical and reasonable to distribute the fund to the members of Class 1. To choose Class 2 claimants is to select a class determined as of an arbitrary cut-off date seemingly unrelated to the main issues raised in the complaints or emphasized in the settlement hearing. If the right to the fund is viewed as being transferable, why should the fund go to persons who held the stock on the day following approval of the settlement, or on any other day which was dependent on the willingness of the parties to settle and seek court approval? The arbitrary nature of preferring subsequent transferees over those who were in a position to be misled is further demonstrated by the fact that the Class 2 claimants are bound to include not only several initial transferees of the stock but any number of transferees several transactions removed from the Class 1 claimants.

Viewing the overall equities of the situation, including the claims made, the form of the settlement, the treatment of the settlement by the parties and the Courts, it is more reasonable and logical to distribute the fund on deposit, less counsel fees and litigation expenses to be allowed by this Court, to the Class 1 members.

An order will be entered in accordance with this opinion.